Good morning Mr. Heller, you have three minutes for rebuttal and at the end of it you're ready. Thank you, your honor. May it please the court, Brian Heller, Schwartz, Perry, and Heller before the plaintiff. The court in granting summary judgment in this case improperly made credibility determinations and resolved questions of fact. This case involves a policy focusing on race that consumed the New York City Department of Education in 2018. This policy came from the very top from Mayor Bill de Blasio and Chancellor Richard Carranza. Under this initiative- Before you get to the policy, I just want you to focus on the articulated reason they gave for demoting the client. The reason they gave is that there was all types of complaints from various employees about her supervision, including three white employees. The supervisor who made the decision to demote her was white. So in light of that articulated reason and the evidence that they had, what would be the basis for a rational jury finding that Ms. Winkfield, whatever the policies of DOE were, was motivated in this decision because your client is white? Yes, your honor. Well, let's look at the evidence of what happened with the demotion in the light most favorable to Chislett. First of all, the fact that Courtney Winkfield is white does not determine her intent. The Supreme Court and Ancali noted that you can't assume that one person of the one protected category- It's all together. I can state that alone. No, I understood. I understood. That was my first point. Let me just focus you on the fact that if we have a lot of case law that says if an employee gets a lot of complaints from employees, even if your client says, although she does admit that she made certain of these comments, but even if she says those employees, they don't like me, they're all wrong. If there's no controverted evidence that the complaints were received, then how can you attribute it to race? But there is controverted evidence that these complaints were received. Okay, they say- There's no- Hold on. They named all the people that Ms. Winkfield, when all the people, what they provided her, right? The names of those people. Did you depose any of those people? Are there declarations of any of those people saying, I didn't make those statements to Ms. Winkfield, she made those up? Well, first of all, let's look at Winkfield's testimony about it. It was vague. She named a couple of people. And what she said was that some of them were comments made in passing, she couldn't give any details, there's no declaration. She said three white employees, and she gave the names of the employees, told her that your client was very inconsistent with the way she enforced rules and policies. She was overly harsh with some employees, overly accommodating with others, that she didn't conduct herself professionally in small group settings. And generally didn't feel that she was an effective leader. So that's what Ms. Winkfield said. And in order to, on summary judgment, you have to place that in dispute, that those employees did not report that to Ms. Winkfield. She made that up because she harbors animus, racial animus towards your client, and I didn't see any evidence of that. Well, we gotta look at the larger context of what's going on. First of all, there is no evidence besides Courtney Winkfield's testimony. There's no contemporaneous documentation. There was no mention of this to the plaintiff at the time. And Courtney Winkfield also testified that the issues on Chislett's team occurred along racial lines. If there's- Just back you up to, I think maybe the first thing you said, that Winkfield testified that these happened. But to controvert something, you can't simply just say, yeah, no, that didn't happen. Because Winkfield is saying, people came to me to report this, right? So the way to controvert that would be statements from, say, those three people, or one of the three people, to say, I never went to Winkfield. So let's say, if I tell you, look, I took a taxi to the court today. And you can't defeat some re-judgment if it all turns out whether I took a taxi and say, yeah, you know what, I don't believe you. I don't believe you. That would not be enough to create a genuine issue of material fact if I have an affidavit saying I took a taxi. No, but in this case- What do you have that would be evidence of some form, affidavit, deposition, whatever, to say that those people did not, in fact, go to Winkfield as she said happened? Well, there's two points. Take that point narrowly and then go on. Yes, Your Honor, there's two points I would make. First of all, there is a question, in fact, about whether these complaints actually occurred. She still had positive relationships with her co-workers. She was never told there were any complaints about her. So the positive relationship you're saying, she said she had positive relationships. Therefore, it is Winkfield's testimony is implausible. It is implausible that anyone would have complained about her, given that she says, I got along with everybody. I'm saying it's very easy for Courtney Winkfield in a deposition being questioned about the decision to demote, embellish that there were complaints made about Lesley- Right, so what's the evidence that she embellished? I guess the question is, does the plaintiff on summary judgment have to disprove everything that the defendant says? Is the defendant's vague comment that this happened with nothing more, does that shift the burden on summary judgment for the plaintiff to have to disprove that? Because in every employment decision case, it'd be very easy for a defendant to come in and say, I got complaints from various people. And then every plaintiff would have to chase down all of those people. But specifically named people, as Judge Bianco pointed out. Some of these people had a clear racial bias against the plaintiff. And frankly, if we look at the- The white employees had a clear racial bias? Well, is it impossible that, look at the context of what was going on. Give us the evidence that shows that those particular employees had a clear racial bias. You said they did, so where's the evidence? What I'm saying is that- Page in the appendix, just be concrete. Just, I feel like I'm not able to get my point out clearly, so let me try again. The issue isn't, did these people have a bias against her? But did Lesley Chislett's race play a role in how she was viewed by her colleagues? When Courtney Wingfield came in, and came Lesley Chislett's boss, this was after years of Lesley Chislett being accused of being told that she lives in a white supremacist world. That white people need to step back and let colleagues of color come in. And she pushed back on that. In your point in the depositions that you said to the African American employee, could you step out of your skin for a moment? I said, you're a pretty black girl, refer to another one, because you couldn't pronounce their name right, it's Osama Bin Laden. There were a lot of things that she swore to and admitted to in her affidavit. So to suggest that this was just a made up scenario by the Department of Education is not even borne out by your client's own testimony. Those were things that were all deemed unsubstantiated. They were not deemed a violation of the law. And Courtney Wingfield- Wait, wait, I have your deposition. Your client admitted she made those statements. She said they were taken out of context. But she, I agree, it was inappropriate for me to say, could you step out of your skin for a moment? That's your client's words. And it was deemed not to be a violation of law, and it was better language could have been used. And these were in the context of, there was courageous conversations coming on where they were told, we need to talk about race. Courtney Wingfield told Leslie Chislett at one point, told the department, you need to talk about yourself, say, as a white person or as a black person. These were highly racially charged environments. Can I ask you to correct the part of your argument as opposed to the argument with respect to demotion and discharge, the part of your argument that relates to the claim of hostile work environment. Do you have something to say about that as a separate matter? Certainly, Your Honor. This was a case where there were trainings initiated by the mayor and the chancellor that focused on race. And this wasn't just about implicit bias and acknowledging our implicit bias. This went on to saying that Caucasians were responsible for the ills of the Department of Education and that they had to step back to let people of color take over. It demonized white people, saying, she was told at these trainings, white colleagues must take a step back and yield to colleagues of color. The deputy chancellor said, we've all taken on whiteness, with whiteness being a negative thing. She was told that her interest in excellence was perfectionism and consistent with white supremacy. The head of her department said there is white toxicity in the air and we all breathe it in. She was told, you're probably going to question your job security. You're probably going to wonder how you feel you belong right now. It was constant reaffirmation from the top that her race played a role and that she needed to step back. The comments that you're citing were in the course of the implicit bias trainings? Well, this was the team that was tasked with scaling implicit bias trainings throughout the city. I think there were three or four comments on page 45 of your brief that you cite, some of which you mentioned here. But my understanding is that at least three out of the four, one was an interaction with another employee, occurred at the implicit bias trainings, yes or no? Well, yes, there were certainly comments made at implicit bias trainings. They were made by supervisors, by consultants brought in, by colleagues. It was a barrage, and ultimately it forced- Statements that were made by, where do you cite those statements? Certainly, your honor. Well, I thought there were four statements mentioned in your brief. No, there was far more than four. There's slides that we submitted at- I thought that was in the context of the implicit bias training. It was, it was. So these- How many implicit bias training sessions were there? Well, there was a number, there were some trainings that were done to help the team create the implicit bias training. So it's a bit of a mix of different things. It wasn't just some low-level employee at an implicit bias training in the field. This was the team that was building these trainings. I think the question was how many. How many, how many trainings were there? There were at least five trainings, and I'm sorry, there were seven events where these trainings occurred. Darnisa Amante was a consultant that was brought in, and she said that, she's the one who said, I'm going to ask you while naming your privilege to acknowledge that you have to step back from some things, and that you're not going to feel good. And within a month of that, Leslie Chisholm was demoted. There was a message to this department that we need to focus on race, and that came from the mayor, too. All right, all right, we understand the position. Thank you, Mr. Heller. We'll hear from the city, Ms. O'Brien. May it please the court, Lauren O'Brien on behalf of the Department of Education. The district court correctly found that there was insufficient evidence to support the plaintiff's Monel claims here. In particular, she failed to establish a causal link between any official municipal policy under Chancellor Carranza's administration and her alleged constitutional injuries. To start, as has been discussed, in this particular case, she cannot show the causal link in particular as a result of the agency's stated reason for shifting her responsibilities, which had to do with the many complaints it received about her ineffective leadership and the issues with her team throughout her time at the Department of Education. In addition, I think it's crucial here that she admits that the issues that she had with her team predated Chancellor Carranza's administration, and began in 2017, and that is when an OEO report was filed against her, which contains several allegations that are echoed later in the complaints that were made to Wingfield about her leadership. So there's really no argument that the issues she was having can be attributed to any particular policy on the part of the administration. The only statements that she relies on that were made by Chancellor Carranza were about the values of diversity and high-level leadership, and there's no real dispute here that she was not a member of high-level leadership. And no reasonable jury could find here that there was a policy of demoting employees at the plaintiff's level. Would you be able to turn to the hostile work environment question? So the hostile work environment claim can be dismissed on the basis that the district court concluded, which is that it cannot meet the requirements of Monell. The claim, so in particular, those reasons are that she relies on statements by OEA staff, which do not reflect that there was any department-wide race-based policy. She doesn't establish that there was any involvement by Chancellor Carranza in either developing these trainings or participating in these trainings. So you would agree that some of these trainings are incredibly problematic, right? I think regardless of whether there were statements- It could be a rise to a hostile work environment if they were attributable as a policy to the city, right? I think that to the extent that she identifies offensive statements that were made during conversations or during training, those- Even in part of the trainings, I mean, some of these are incredibly, are really incredibly racist, frankly, right? I mean, saying something like, white colleagues need to step back, or there's white toxicity in here. If you've swapped out any other racial or religious or ethnic identity, if you were to say, there's black toxicity in the air, I don't think anybody would pause for even a second before saying that's outrageous and impermissible, right? But I think that- Do you agree with that or not? I think that those could be viewed as offensive and racist. Could be viewed as offensive? Yeah, I mean- Could? I just think it's irrelevant because- If someone said there is black toxicity in the air, would anyone hesitate before saying that that's incredibly and overtly racist? I mean, I think that the- I mean, I'm just trying to see, what is the city's position as to that? In isolation, yes, I think the context is important. In context, it's not? You can put that into a context that's permissible and not racist? I'm talking about the specific context here in which she was working in an office that was, their goal was to address inequities in the New York City school system. Yeah, and you think that in context, statements like that can be permissible, that you can isolate a particular racial or ethnic group and label them as-  As sort of being the font of toxicity? Based on their race or ethnicity or religion. Is that ever permissible? Absolutely not. But I think the point is that those statements made by outside vendors or by staff- Oh, I get the idea, your argument that it's not traceable to leadership, but I'm just saying that the kinds of things that were said, I don't see how the city- I'm a little concerned if you're saying that, if you're hedging, that the city thinks that some of these statements are not overtly racist. No, I am not pushing back on that. I don't really understand your position. I mean, the business of distinguishing between what comes from what is traceable to the city, what is policy, and what is simply the casual remarks of people, there's a big difference, it seems to me, between what we have here and circumstances where you might have some co-worker, a number of- even a number of co-workers who say racist things, but that's not traceable to the city. But here, it seems to me, this came in the form of department-sponsored programs, and she complained to higher-ups about things that were said to her, and she, I mean, if we believe her, according to her version of it, she was brushed off and got no support, despite the saying of what seemed to be obviously racist things to her. So I don't really see what your defense is of the proposition that this is not attributable to the city. It seems to me that these were programs, programs that were official policy. Maybe, you know, maybe the chancellor didn't explicitly say, I agree with these statements, but these things did come- these were things that were- that came from the administration. These were things that were promoted by the department. It wasn't just- it wasn't, excuse me, just casual remarks by biased co-workers that are not attributable to the entity. Your Honor, it's the plaintiff's burden and Monell claim to articulate that there was a specific policy that reflected a deliberate decision on the part of the municipality. But why isn't that- why isn't that done by showing that the training programs sponsored by the- by the city, sponsored by the Department of Education, propagated with apparent approval these racist messages? And that complaints about them to- to higher-ups were dismissed as, no, you've just got to- you've just got to accept that. This is the- this is the- this is the policy of the department. I think that the trainings were planned at- at the office level, and there's no evidence set forth that the chancellor either selected the trainings or played any part- It doesn't have to go to the chancellor himself. This is a huge department, and the department was sponsoring- the department was sponsoring these- the- the events that propagated these messages. Respectfully, I think under Monell, it does have to go to the chancellor himself because he's the only- Didn't Judge Viscoso, in the case they cite, find that there was sufficient evidence that this was, at least in that case, that it was caused by the policies of the city, or no? So that- I think you're talking about the Herrera case, the other district court case. So in that case, I don't believe there was a hostile work environment claim that was made there. No, but there was- there was still attributed to the policies, even though it wasn't a hostile work environment claim, that these policies, that the same type of policies we're talking about here, right? So the- the only- the policy that- first of all, it was found that there was a triable issue of fact as to whether this policy existed, and the policy was a policy of curating the racial composition of the senior leadership of the DOE. So it had nothing to do- That's a wonderful euphemism. Curating the racial composition. Those are- those are the words that were used by the district court. That means discriminating based on race, right? But at the level of senior leadership, at sort of the cabinet level, I think that was- I think it was made by Chancellor Carranza about, you know, diversity in senior leadership. You alternatively argue on the hostile work environment claim, you know, it wasn't the basis for the district court decision, that these weren't- the comments in the training sessions were however many they were. I don't know whether they occurred at all, five. Would you want to speak to that? How many training sessions- with respect to the statements that have been identified, how many training sessions are we talking about? So I think-  Right, I don't think it's, you know, always entirely clear which trainings were technically implicit bias trainings versus internally planned trainings that were separate from the implicit bias trainings. And I think that that's, you know, one issue that the plaintiff has, because the only statement from Chancellor Carranza that he relies on is that there was to be an implicit training- implicit bias training for DOE employees. And I, you know, I acknowledge that there were statements that he had- that she refers to that were within the context of an implicit bias training. But I think the point is more that many of the statements that she relies on are just statements with her colleagues outside of the context of any training or statements during internal OEA meetings that had nothing to do with the implicit bias trainings. And I think given that, just go- I know you wanted me to, you know, talk about the merits of the hostile work environment claim. But I think given that, the connection between her hostile work environment claim and any municipal policy is just too tenuous to support her- her Monell claim. Thank you. Thank you. Very briefly, I just wanted to respond to the argument about whether or not there was a connection to the mayor and the chancellor. There is significant evidence that the mayor and the chancellor were involved behind these. The implicit bias trainings came from the mayor's office. It came before Carranza was even selected. You say they came from, meaning the impetus to create implicit bias trainings, but not the specific content like the slides or anything, right? Correct. But there was $23 million allocated for this implicit bias training. And the chancellor's office determined how that was going to be spent. The leaders who were implementing these repeatedly talked about how this was a chancellor's priority. LaShawn Robinson reported to the chancellor what was going on with these trainings. There's a significant amount of evidence to connect it. And these trainings exacerbated what was already a very racially charged workplace for Leslie Gislett. It became much more significant. And these weren't just random off comments. These were significant comments. And when she complained about it to her supervisors, nothing was done. She was told that this is the policy. They're not going to- not going to change. And another way to connect to this policy, these trainings to the city, was there was a New York Post article about these. It was- a lot of tension played to these. There was- the city council had a letter from a bipartisan commission complaining about these trainings. And the chancellor's response was to defend them. There was a counter protest. And the chancellor supported that. This was a very public and highly controversial issue. And Leslie Gislett was a source. She was supposed to be anonymous to the New York Post. But the New York Post asked the DOE, tell us about these trainings and what's Leslie Gislett's title. And then a couple of days later, there was this retreat that was supposed to happen. And the leaders got up and said, there are people here among us who act like they're for us, but they're not with us. There was another supervisor said that we're going to talk about the elephant in the room. And everyone knew they were talking about Leslie Gislett. And she was attacked. She was told just go. She was told she can't help children. And she left in tears. And she couldn't come back. And her supervisors in this case acknowledged that they wouldn't have gone back either in this case. She's not the flat character that the city makes her out to be. She's dedicated her career to helping children. She was handpicked for the mayoral priority of AP for All. But because she was white and because she refused to accept that her whiteness was a problem, she was pushed out. This case is a Rorschach test. And the judge should not have assumed that its decision was the only decision. Thank you.